# UNITED STATES DISTRICT COURT
## FOR THE DISTRICT OF MASSACHUSETTS

| | |
|---|---|
| IN RE: MOVEIT CUSTOMER DATA SECURITY BREACH LITIGATION | MDL No. 1:23-md-03083-ADB-PGL<br><br>Judge Allison D. Burroughs |
| This Document Relates To:<br>C.A. No. 1:23-cv-12993-ADB<br><br>MICHAEL EVANGELISTA, individually and on behalf of all others similarly situated,<br><br>        Plaintiff,<br><br>v.<br><br>NATIONAL STUDENT CLEARINGHOUSE and PROGRESS SOFTWARE CORPORATION,<br><br>        Defendants. | |

**MEMORANDUM OF LAW IN SUPPORT OF PLAINTIFF'S UNOPPOSED MOTION
FOR FINAL APPROVAL OF PROPOSED CLASS ACTION SETTLEMENT**

# TABLE OF CONTENTS

TABLE OF CONTENTS ............................................................................................................. i

TABLE OF AUTHORITIES ................................................................................................... iii

INTRODUCTION .................................................................................................................... 1

BACKGROUND ....................................................................................................................... 2

   I.   History of the Litigation. ........................................................................................... 2

   II.   Negotiation of the Proposed Settlement. ............................................................. 4

   III.   The Settlement Provides Significant Benefits to the Settlement Class. .............. 5

      A.   The Proposed Settlement Benefits Plan. ........................................................ 5

      B.   Dismissal and Release of Claims. .................................................................... 7

   IV.   Results of Settlement Administration and Notice Plan. ..................................... 7

ARGUMENT ............................................................................................................................ 9

   I.   The Proposed Settlement is Fair, Reasonable, and Adequate and Should be Finally Approved. ............................................................................................................. 9

      A.   The Complexity, Expense, and Likely Duration of the Litigation. ................... 11

      B.   The Reaction of the Settlement Class to the Settlement ................................... 12

      C.   The Stage of the Proceedings and Amount of Discovery ................................. 13

      D.   The Risks of Establishing Liability and Damages. ............................................ 15

      E.   The Risks of Maintaining the Class Action Through Trial. ................................ 17

      F.   The Ability of the Defendant to Withstand a Greater Judgment. ...................... 17

      G.   The Range of Reasonableness of the Settlement Fund in Light of the Best Possible Recovery and the Attendant Risks of Litigation. ................................................. 18

   II.   The Settlement Benefits Plan is Fair, Reasonable, and Adequate and Should be Finally Approved ................................................................................................................. 20

   III.   The Court Should Finally Certify the Settlement Class. ..................................... 21

      A.   The Settlement Class Meets the Requirements of Rule 23(a). ......................... 22

         1.   Numerosity. ................................................................................................. 22

         2.   Commonality. .............................................................................................. 22

         3.   Typicality. .................................................................................................... 24

         4.   Adequacy. .................................................................................................... 25

      B.   The Settlement Class Meets the Requirements of Rule 23(b). ........................ 26

         1.   Common Issues Predominate Over Individual Issues. ............................... 26

         2.   A Class Action is the Superior Device for Adjudicating the NSC Action. .............. 28

IV.    The Notice Program Satisfied Rule 23 and Due Process by Providing Settlement Class Members with Adequate Notice of the Settlement..........................................................29

CONCLUSION........................................................................................................................ 31

# TABLE OF AUTHORITIES

## Cases

*Abubaker v. Dominion Dental USA, Inc.*,
   2021 WL 6750844 (E.D. Va. Nov. 19, 2021) ............................................. 24

*Amchem Prods., Inc. v. Windsor*,
   521 U.S. 591 (1997) ........................................................................... 21, 26

*Amgen Inc. v. Connecticut Ret. Plans & Tr. Funds*,
   568 U.S. 455 (2013) ................................................................................ 26

*Attias v. CareFirst, Inc.*,
   346 F.R.D. 1 (D.D.C. 2024) ..................................................................... 21

*Bezdek v. Vibram USA Inc.*,
   79 F. Supp. 3d 324 (D. Mass.) ....................................................... 10, 12, 24

*Bussie v. Allmerica Fin. Corp.*,
   50 F.Supp.2d 59 (D. Mass. 1999) ...................................................... 10, 12

*Carter v. Vivendi Ticketing US LLC*,
   2023 WL 8153712 (C.D. Cal. Oct. 30, 2023) ...................................... 11, 16

*City of Detroit v. Grinnell Corp.*,
   495 F.2d 448 (2d Cir. 1974) ....................................................... 10, 15, 18

*Corra v. ACTS Ret. Servs., Inc.*,
   2024 WL 22075 (E.D. Pa. Jan. 2, 2024) .................................................. 28

*D'Amato v. Deutsche Bank*,
   236 F.3d 78 (2d Cir. 2001) ....................................................................... 17

*Diaz v. FCI Lender Servs., Inc.*,
   2020 WL 4570460 (S.D.N.Y. Aug. 7, 2020) ............................................ 13

*Engel v. Scully & Scully, Inc.*,
   279 F.R.D. 117 (S.D.N.Y. 2011) .............................................................. 22

*Fid. & Guar. Ins. Co. v. Star Equip. Corp.*,
   541 F.3d 1 (1st Cir. 2008) .......................................................................... 9

*Fulton-Green v. Accolade, Inc.*,
   2019 WL 4677954 (E.D. Pa. Sept. 24, 2019) ........................................... 11

iii

*Green-Cooper v. Brinker Int'l, Inc.*,
 73 F.4th 883 (11th Cir. 2023)......................................................................... 27

*Hall v. ProSource Techs., LLC*,
 2016 WL 1555128 (E.D.N.Y. Apr. 11, 2016) ............................................... 18

*Harbour v. California Health & Wellness Plan*,
 2024 WL 171192 (N.D. Cal. Jan. 16, 2024) ................................................. 19

*Hashemi v. Bosley, Inc.*,
 2022 WL 18278431 (C.D. Cal. Nov. 21, 2022) ............................................ 13

*Hill v. State Street Corp.*,
 2015 WL 127728 (C. Mass. Jan. 8, 2015 ................................................ 20, 30

*Hochstadt v. Bos. Sci. Corp.*,
 708 F. Supp. 2d 95 (D. Mass. 2010) ........................................................ 13, 20

*Holden v. Guardian Analytics, Inc.*,
 2024 WL 2845392 (D.N.J. June 5, 2024)............................................ 11, 12, 14

*In re Anthem, Inc. Data Breach Litig.*,
 327 F.R.D. 299 (N.D. Cal. 2018).................................................. 23, 24, 25, 28

*In re Brinker Data Incident Litig.*,
 2021 WL 1405508 (M.D. Fla. Apr. 14, 2021) ............................................. 27

*In re Cabletron Sys., Inc. Sec. Litig.*,
 239 F.R.D. 30 (D.N.H. 2006) ....................................................................... 13

*In re Cap. One Consumer Data Sec. Breach Litig.*,
 2022 WL 18107626 (E.D. Va. Sept. 13, 2022) ....................................... 19, 29

*In re Celexa & Lexapro Mktg. & Sales Pracs. Litig.*,
 325 F.R.D. 529 (D. Mass. 2017)................................................................... 26

*In re Colgate-Palmolive Softsoap Antibacterial Hand Soap Mktg. & Sales Pracs. Litig.*,
 2015 WL 7282543 (D.N.H. Nov. 16, 2015) ................................................ 21

*In re Equifax Inc. Customer Data Sec. Breach Litig.*,
 2020 WL 256132 (N.D. Ga. Mar. 17, 2020).................................................. 16

*In re Forefront Data Breach Litig.*,
 2023 WL 6215366 (E.D. Wis. Mar. 22, 2023).............................................. 19

*In re Fortra File Transfer Software Data Sec. Breach Litig.*,
　2024 WL 4547212 (S.D. Fla. Sept. 18, 2024) ........................ 15

*In re GSE Bonds Antitrust Litig.*,
　414 F. Supp. 3d 686 (S.D.N.Y. 2019) .................................. 17

*In re LastPass Data Sec. Incident Litig.*,
　2024 WL 3580646 (D. Mass. July 30, 2024)........................... 15

*In re Lincare Holdings Inc. Data Breach Litig.*,
　2024 WL 3104286 (M.D. Fla. June 24, 2024)......................... 19

*In re Lupron Mktg. & Sales Pracs. Litig.*,
　228 F.R.D. 75 (D. Mass. 2005) ........................................... 9

*In re Marriott Int'l Customer Data Sec. Breach Litig.*,
　345 F.R.D. 137 (D. Md. 2023)............................................. 17

*In re Marriott Int'l, Inc. Customer Data Sec. Breach Litig.*,
　341 F.R.D. 128 (D. Md. 2022)....................................... 17, 21

*In re Marriott Int'l, Inc.*,
　78 F.4th 677 (4th Cir. 2023).............................................. 17

*In re Namenda Direct Purchaser Antitrust Litig.*,
　462 F. Supp. 3d 307 (S.D.N.Y. 2020) ................................. 15

*In re New Motor Vehicles Canadian Exp. Antitrust Litig.*,
　522 F.3d 6 (1st Cir. 2008) .................................................. 22

*In re Puerto Rican Cabotage Antitrust Litig.*,
　815 F. Supp. 2d 448 (D.P.R. 2011) ..................................... 10

*In re Solodyn (Minocycline Hydrochloride) Antitrust Litig.*,
　2017 WL 4621777 (D. Mass. Oct. 16, 2017) .................... 26, 28

*In re Sonic Corp. Customer Data Sec. Breach Litig.*,
　2020 WL 6701992 (N.D. Ohio Nov. 11, 2020)...................... 21

*In re Sonic Corp. Customer Data Sec. Breach Litig.*,
　2019 WL 3773737 (N.D. Ohio Aug. 12, 2019) ................. 15, 16

*In re Sturm, Ruger, & Co., Inc. Sec. Litig.*,
　2012 WL 3589610 (D. Conn. Aug. 20, 2012) ....................... 18

*In re Target Corp. Customer Data Sec. Breach Litig.*,
    309 F.R.D. 482 (D. Minn. 2015) ............................................................................ 21

*In re Target Corp. Customer Data Sec. Breach Litig.*,
    2015 WL 7253765 (D. Minn. Nov. 17, 2015) ........................................................ 11

*In re TJX Cos. Retail Sec. Breach Litig.*,
    246 F.R.D. 389 (D. Mass. 2007) ............................................................................ 15

*In re Tyco Int'l, Ltd. Multidistrict Litig.*,
    535 F. Supp. 2d 249 (D.N.H. 2007) ........................................................... 10, 12, 16

*In re Yahoo! Inc. Customer Data Security Breach Litig.*,
    2020 WL 4212811 (N.D. Cal. July 22, 2020) ....................................................... 11

*Jermyn v. Best Buy Stores, L.P.*,
    2012 WL 2505644 (S.D.N.Y. June 27, 2012) ....................................................... 18

*In re M3 Power*,
    270 F.R.D 45 (D. Mass. Aug. 6, 2010) ........................................................... 24, 25

*Meaden v. HarborOne Bank*,
    2023 WL 3529762 (D. Mass. May 18, 2023) ............................................. 9, 22, 30

*Morris v. Affinity Health Plan, Inc.*,
    859 F. Supp. 2d 611 (S.D.N.Y. 2012) ................................................................... 18

*Nat'l Ass'n of Chain Drug Stores v. New England Carpenters Health Benefits Fund*,
    582 F.3d 30 (1st Cir. 2009) .................................................................................... 10

*New England Biolabs v. Miller*,
    2022 WL 20583575 (D. Mass Oct. 26, 2022) ....................................................... 20

*Roberts v. Source for Pub. Data*,
    2009 WL 3837502 (W.D. Mo. Nov. 17, 2009) ..................................................... 28

*Roberts v. TJX Companies, Inc.*,
    2016 WL 8677312 (D. Mass. Sept. 30, 2016) ..................................... 10, 12, 13, 17

*Savidge v. Pharm-Save, Inc.*,
    2024 WL 1366832 (W.D. Ky. Mar. 29, 2024) ...................................................... 21

*Tyson Foods, Inc. v. Bouaphakeo*,
    577 U.S. 442 (2016) ............................................................................................... 26

*Wal-Mart Stores v. Dukes*,
   564 U.S. 338 (2011)......................................................................................... 23, 27

*Wright v. S. New Hampshire Univ.*,
   565 F. Supp. 3d 193 (D.N.H. 2021)......................................................................... 30

**Rules**

Fed. R. Civ. P. 23.................................................................................................... *passim*

## INTRODUCTION

Plaintiff Michael Evangelista ("Plaintiff" or "Settlement Class Representative"), individually and on behalf of all others similarly situated, and pursuant to Rule 23(e), respectfully moves this Court for final approval of the proposed Class Action Settlement Agreement ("Settlement" or "SAR") with Defendant National Student Clearinghouse ("NSC" or "Defendant").[1] Final Approval should be granted because the Settlement provides substantial relief for the Settlement Class, including the payment of $9.95 million by NSC into a non-reversionary Settlement Fund to: (1) be allocated to the Settlement Class according to the proposed Settlement Benefits Plan[2]; (2) pay for attorneys' fees and expenses and a Service Award to the Settlement Class Representative, as approved by the Court; and (3) cover the costs of settlement administration and the issuance of notice. According to the proposed Settlement Benefits Plan, the Net Settlement Fund (after deducting Court-approved attorneys' fees and expenses, any Court-approved Service Award, and notice and administration costs) will be used to pay for Settlement Class Members' claims for two (2) years of credit monitoring and identity theft protection, and either: (1) reimbursement of ordinary losses up to $2,500.00 (including lost time of up to four (4) hours at $25.00 per hour) and reimbursement of extraordinary losses up to $10,000.00; or (2) an alternative cash payment of $100.00.

On October 11, 2024, the Court granted preliminary approval of the Settlement. ECF No. 1266. Pursuant to the Court's Preliminary Approval Order, Notice was effectuated to the Settlement Class, notifying them of the proposed Settlement, as well as CAFA Notice to the Attorney General of the U.S., the Attorneys General of each of the 50 states, and all other required

---

[1] Unless otherwise defined herein, all capitalized terms have the same definitions as those set forth in the proposed Class Action Settlement Agreement and Release, ECF No. 1223-1.

[2] The proposed Settlement Benefits Plan is attached as Exhibit 2 to the Lynch Declaration in Support of Preliminary Approval, ECF No. 1223-2.

recipients. *See* Declaration of Cameron A. Azari ("Azari Decl.") ¶¶ 11–18; ECF No. 1246, 1246-1. Thus far, the Notice results have been overwhelmingly positive. To date, 1,409,234 of 1,470,038 Settlement Class Members have received direct notice of the Settlement, a notice rate of approximately 95.8%. Azari Decl. ¶ 18. Thus far, no Settlement Class Members have objected to the Settlement and only six have opted out. *Id.* ¶¶ 22. As detailed below, the Settlement is an excellent result for the Settlement Class; the Court should find that the Settlement is fair reasonable, and adequate; and the Court should therefore grant final approval of the Settlement.

## BACKGROUND

### I. History of the Litigation.

Plaintiff's claims against NSC arise out of a security incident stemming, in part, from a vulnerability in MOVEit Transfer. *See* Compl. ¶¶ 5, 9–10, 34.[3] MOVEit Transfer is a subscription-based managed file transfer application developed and licensed by Progress Software Corporation ("Progress") and used by numerous commercial and government entities, including NSC, to transfer large data files. *Id.* ¶¶ 2–3; ECF No. 908, ¶¶ 11–12. Between May 27, 2023 and May 31, 2023, CL0P Ransomware Gang exploited a vulnerability in the MOVEit Transfer application. *See* ECF No. 908 ¶¶ 90–155. CL0P used the MOVEit vulnerability to escalate user privileges, gain unauthorized access to customers' MOVEit Transfer environments, and access, copy, and exfiltrate the sensitive information stored therein (the "Security Incident"). *See* ECF No. 908 ¶¶ 96–153. Shortly after exploiting the MOVEit Transfer vulnerability, CL0P threatened to name and publish the leaked data of any organizations that did not respond to its ransom demands. *See* ECF No. 908, ¶¶ 175–179, 207–208.

---

[3] Citations to "Compl." are citations to Plaintiff's Complaint. *See Evangelista v. National Student Clearinghouse, et al.*, Case No. 1:23-cv-12993-ADB (D. Mass.), ECF No. 1.

NSC provides educational reporting and verification services to educational institutions, employers, and other organizations. *See* Compl. ¶ 32. In order to provide these services, NSC "collects data on student enrollment, academic progress, and educational outcomes to help educational institutions accomplish their missions." Compl. ¶ 15. NSC further stated that "our work – performed in a trusted, secure, and private environment – provides numerous time- and cost-savings benefits to students, schools, administrators, and requestors." *Id.*

In connection with providing these services, NSC may maintain individuals' information, including some Social Security numbers. *See* Compl. ¶¶ 32–33. Plaintiff and Settlement Class Members are current and former students whose information is used by NSC for performing services for institutions of higher education and other organizations. *See* Compl. ¶ 32 (explaining NSC provides services on behalf of educational institutions, students, alumni, employers, and other organizations). NSC provided its services to these institutions and other organizations and, as a result, maintained Plaintiff's and Settlement Class Members' Social Security numbers. *See* Compl. ¶¶ 34, 37.

Although the Security Incident involved an exploit of the MOVEit Transfer application, Plaintiff alleges that NSC's negligence contributed to the breach and theft of Plaintiff's and Settlement Class Members' Social Security numbers. *See* Compl. ¶¶ 57–59; ECF No. 908 ¶¶ 427–457. NSC denies these allegations and any fault or liability in this matter. Plaintiff further alleges that Progress should have warned users, including NSC, that MOVEit Transfer was "not set it and forget it" with respect to security, and that additional steps should have been taken to secure the data transferred with MOVEit Transfer. ECF No. 908 ¶¶ 458–466. Plaintiff claims NSC could have prevented or mitigated the Security Incident by implementing reasonable data security measures to secure its MOVEit Transfer environment. *See* Compl. ¶¶ 51–53; 57–59; ECF No. 908

¶¶ 427–431. NSC denies these allegations. Consequently, Plaintiff sued NSC and Progress for the alleged harm caused by the theft of his highly personal and private information.

## II. Negotiation of the Proposed Settlement.

During the early procedural phase of this multi-district litigation ("MDL"), Co-Lead Counsel and the Settlement Committee, and counsel for NSC agreed to an early mediation of the claims asserted against NSC to attempt to resolve NSC's alleged liability for the Security Incident. *See* ECF No. 1223, ¶ 15. Specifically, the Parties agreed to mediate with Hon. Diane M. Welsh (Ret.), who mediated several other cases in the *MOVEit* MDL. *Id*. ¶ 16. Prior to mediation, the Parties engaged in informal discovery, wherein NSC provided information about the Security Incident, including information concerning NSC's use of MOVEit Transfer, and the types of information impacted in the Security Incident. *Id.* ¶ 17. The Plaintiffs' Settlement Committee was therefore well informed regarding the facts of the case, and the strengths and weaknesses of Plaintiffs' claims and NSC's defenses leading into the mediation. *See id.* ¶¶ 17.

On April 29, 2024, the Parties engaged in a full-day mediation with Judge Welsh. *See id*. ¶ 18. These good-faith and hard-fought negotiations resulted in an agreement in principle. *Id*. Following the mediation, the Parties engaged in a series of further arm's-length discussions, during which the Parties negotiated, drafted, and finalized the terms of the Settlement Agreement. *Id*. ¶ 19. The Settlement Agreement was fully executed by the Parties as of August 26, 2024. *See* ECF No. 1223-1.

Plaintiff thereafter moved for preliminary approval of the Settlement, which this Court granted on October 11, 2024. ECF No. 1266. In the Court's preliminary approval order, the Court preliminarily certified the following Settlement Class for purposes of settlement:

> All persons in the United States whose Social Security Number was included in the files affected by the Security Incident.

Excluded from the Settlement Class are: (i) NSC, any entity in which NSC has a controlling interest, and NSC's officers, directors, legal representatives, successors, subsidiaries, and assigns; (ii) any judge, justice, or judicial officer presiding over the Litigation and the members of their immediate families and judicial staff; and (iii) any individual who timely and validly opts out of the Settlement.

ECF No. 1266.

## III. The Settlement Provides Significant Benefits to the Settlement Class.

Under the Settlement Agreement, NSC has agreed to pay $9.95 million into a non-reversionary Settlement Fund to resolve Plaintiff's and Settlement Class Members' claims against the Defendant Released Parties. SAR § 3.1. The Settlement Fund will pay for: (1) costs of Notice and Settlement Administration; (2) any Court-approved Service Award for the Settlement Class Representative; (3) any Court-approved attorneys' fees and expenses; and (4) Settlement Payments for the Settlement Class pursuant to the Settlement and the proposed Settlement Benefits Plan, as approved by the Court. *Id.* § 3.3. The Settlement also requires NSC to make business practices changes specifically designed to prevent future data breaches arising out of third-party file transfer products or tools. *Id.* § 5.

### A. The Proposed Settlement Benefits Plan.

The Settlement requires that the Net Settlement Fund (after deducting for notice and administration costs, the Settlement Class Representative's Service Award, if any, and attorneys' fees and expenses, as awarded and approved by the Court) be distributed via the Settlement Benefits Plan proposed by Class Counsel and the Settlement Committee. *Id.* at § 3.3. Pursuant to the Settlement Benefits Plan, Settlement Class Members can file claims for two (2) years of credit monitoring and identity theft protection, and either (1) reimbursement of ordinary losses up to $2,500.00 (including lost time of up to four (4) hours at $25.00 per hour) and reimbursement of

extraordinary losses up to $10,000.00; or (2) an alternative cash payment of $100.00 (subject to *pro rata* reduction or increase based on total claim submission). ECF No. 1223-2.

Reimbursement for out-of-pocket ordinary and extraordinary losses are intended to provide relief for costs commonly incurred due to data breaches, including unreimbursed fraud, telephone or cell phone charges, internet usage charges, credit monitoring, costs of credit reports, or fraudulent bank or financial institution charges. Declaration of Gary F. Lynch ("Lynch Decl.") ¶¶ 22. Reimbursement for lost time is intended to provide relief for time incurred responding to the Security Incident, including, for example, monitoring accounts, even if those actions did not cause an out-of-pocket loss. *Id.* ¶ 23. The Alternative Cash Payment is intended to compensate Settlement Class Members for the harm caused by the Security Incident without having to provide documentation of any out-of-pocket losses. *Id.* ¶ 24. Finally, the credit monitoring and identity theft protection services prevent harm from future misuse of the impacted data, a risk all Settlement Class Members face due to having their Social Security numbers compromised in the Security Incident. *Id.* ¶ 25.

To the extent the Net Settlement Fund is not exhausted by the payment of Approved Claims, the value of the Alternative Cash Payments will be increased *pro rata*, up to $1,000.00, or until the Net Settlement Fund is exhausted. ECF No. 1223-2 § 4. If the total value of Approved Claims exceeds the value of the Net Settlement Fund, the value of the Alternative Cash Payments will be decreased *pro rata* to the highest amount that will allow the Approved Claims to be paid using the Net Settlement Fund. *Id.* If any funds remain one hundred and eighty (180) days after the Effective Date, any monies remaining in the Net Settlement Fund will be used to extend all Approved Claims for credit monitoring and identity theft protection services for as long as possible until the Net Settlement Fund is completely exhausted. *Id.*

**B. Dismissal and Release of Claims.**

Upon the Effective Date of the Settlement, the Plaintiff Released Parties shall be deemed to have released any and all liabilities, rights, claims, actions, causes of action, damages, penalties, costs, attorneys' fees, losses or demands, whether known or unknown, liquidated or unliquidated, existing or potential, suspected or unsuspected, legal, statutory, or equitable, based on contract, tort, or any other theory, that result from, arise out of, are based upon, or relate to the conduct, omissions, duties, or matters that were or reasonably could have been asserted against Defendant Released Parties related to the Security Incident. SAR §§ 1.30, 15.1. However, the Settlement does not release claim against Progress. SAR § 1.14 These releases were described in the Court-approved Long Form Notice. Azari Decl. Attachment 3.

**IV. Results of Settlement Administration and Notice Plan.**

Following the Court's issuance of the Preliminary Approval Order, the Settlement Administrator completed the Notice plan set forth in the Settlement. Azari Decl. ¶¶ 9. The Notice plan was designed to reach as many Settlement Class Members as possible. *Id.* ¶ 7. The Notice included the required description of the material terms of the Settlement; the date by which Settlement Class Members could opt out of the Settlement; the date by which Settlement Class Members could object to the Settlement; the Final Approval Hearing date and time; and the Settlement Website address at which Settlement Class Members could access the Long Form Notice, Settlement Agreement, Claim Form, and other related documents and information. Attachment 1–3.

Pursuant to the Preliminary Approval Order, NSC provided the Settlement Administrator with the Class List containing information sufficient to provide Settlement Class Members with direct notice. Azari Decl. ¶¶ 10. The Settlement Class List contained the names, last known addresses, and/or email addresses of 1,473,805 potential members of the Settlement Class. *Id.* The

Settlement Administrator then deduplicated the records, identifying 1,470,038 unique Settlement Class Members. *Id.* The Settlement Administrator also processed the names and addresses through the United States Postal Service National Change of Address database. *Id.* ¶ 15. Thereafter, on February 24, 2025, the Settlement Administrator implemented the Notice plan, disseminating the Notice via email to 1,161,962 members of the Settlement Class and via mail to 274,491 members of the Settlement Class. *Id.* ¶¶ 11, 14. For email Notices returned as undeliverable, the Settlement Administrator searched for available mail addresses and promptly resent those potential Settlement Class Members Notice via mail. *Id.* ¶ 14. This resulted in the dissemination of Notice via mail to 209,207 Settlement Class Members for whom the email Notice was returned as underliverable. *Id.* For mail Notices returned as undeliverable, the Settlement Administrator searched for available addresses and promptly remailed the returned mail Notices. *Id.* ¶ 16. A customary Long-Form Notice with more detail than the Short Form Notice was also made available on the Settlement Website. *Id.* ¶ 19; Attachment 3.

Further, on February 24, 2025, the Settlement Administrator established an informational Settlement Website, https://www.nscsettlement.com/, allowing Settlement Class Members to obtain detailed information about the Settlement, file claims, and to review important documents, including the Long Form Notice, Claim Form, Settlement Agreement, Preliminary Approval, and Motion for Attorneys' Fees. *Id.* ¶ 19. The Final Approval Motion will also be posted to the website.

The Settlement Administrator is also preparing to send a Reminder Notice via email to Settlement Class Members who have not yet submitted Claim Forms, objected, or otherwise opted out. *Id.* ¶ 24.

The deadline to submit an objection or opt out of the Settlement will occur on April 25, 2025. *Id.* ¶ 22. To date, no Settlement Class Members have objected to the Settlement and only six

Settlement Class Members have submitted requests for exclusion. *Id.* The deadline for Settlement Class Members to file claims is May 26, 2025. Class Counsel will be prepared to provide the Court with claims information at the Final Approval Hearing.

As a result of the Notice Plan, at least 95.8% of the identifiable Settlement Class members received direct notice of the Settlement. *Id.* ¶ 26. The Notice here was the best practicable under the circumstances and fully complied with all requirements of due process under the United States Constitution. *Id.* ¶¶ 25–29.

## ARGUMENT

### I. The Proposed Settlement is Fair, Reasonable, and Adequate and Should be Finally Approved.

"Settlement agreements enjoy great favor with the courts as a preferred alternative to costly, time-consuming litigation." *Fid. & Guar. Ins. Co. v. Star Equip. Corp.*, 541 F.3d 1, 5 (1st Cir. 2008) (internal citation and quotations omitted); *see also In re Lupron Mktg. & Sales Pracs. Litig.*, 228 F.R.D. 75, 88 (D. Mass. 2005) ("[T]he law favors class action settlements."). Federal Rule of Civil Procedure 23(e) provides that a proposed settlement in a class action must be approved by the court. Fed. R. Civ. P. 23(e). "The approval of a class-action settlement agreement is a 'two-step process, which first requires the court to make a preliminary determination regarding the fairness, reasonableness, and adequacy of the settlement terms.'" *Meaden v. HarborOne Bank*, No. 23-CV-10467-AK, 2023 WL 3529762, at *1 (D. Mass. May 18, 2023) (citation omitted). "The second step in the settlement approval process requires a fairness hearing, after which the court may give final approval of the proposed settlement agreement." *Id.* (citation omitted).

Under Rule 23, a court may approve a class action settlement if it is "fair, reasonable, and adequate." Fed. R. Civ. P. 23(e)(2). While the First Circuit has not established a fixed test for evaluating the fairness of a class action settlement, courts within this Circuit look to those set forth

by the Second Circuit when reviewing a motion for final approval. *See, e.g.*, *Bezdek v. Vibram USA Inc.*, 79 F. Supp. 3d 324, 343 (D. Mass.), *aff'd*, 809 F.3d 78 (1st Cir. 2015); *In re Puerto Rican Cabotage Antitrust Litig.*, 815 F. Supp. 2d 448, 472 (D.P.R. 2011); *In re Tyco Int'l, Ltd. Multidistrict Litig.*, 535 F. Supp. 2d 249, 258 (D.N.H. 2007). These factors, commonly referred to as the "*Grinnell*" factors, are:

> (1) the complexity, expense and likely duration of the litigation; (2) the reaction of the class to the settlement; (3) the stage of the proceedings and the amount of discovery completed; (4) the risks of establishing liability; (5) the risks of establishing damages; (6) the risks of maintaining the class action through the trial; (7) the ability of the defendants to withstand a greater judgment; (8) the range of reasonableness of the settlement fund in light of the best possible recovery; and (9) the range of reasonableness of the settlement fund to a possible recovery in light of all the attendant risks of litigation.

*Roberts v. TJX Companies, Inc.*, No. 13-CV-13142-ADB, 2016 WL 8677312, at *6 (D. Mass. Sept. 30, 2016) (quoting *City of Detroit v. Grinnell Corp.*, 495 F.2d 448 (2d Cir. 1974), *abrogated on other grounds by Goldberger v. Integrated Res., Inc.*, 209 F.3d 43 (2d Cir. 2000)). Importantly a court need not find all the *Grinnell* factors satisfied to grant final approval, rather the court should conduct a holistic assessment that involves "balancing the advantages and disadvantages of the proposed settlement as against the consequences of going to trial or other possible but perhaps unattainable variations on the proffered settlement." *Nat'l Ass'n of Chain Drug Stores v. New England Carpenters Health Benefits Fund*, 582 F.3d 30, 44 (1st Cir. 2009); *see also Bussie v. Allmerica Fin. Corp.*, 50 F.Supp.2d 59, 72 (D. Mass. 1999) ("This fairness determination is not based on a single inflexible litmus test but, instead, reflects its studied review of a wide variety of factors bearing on the central question of whether the settlement is reasonable in light of the uncertainty of litigation."). A review of the relevant *Grinnell* factors supports a finding that the Settlement is fair, reasonable, and adequate, and should be finally approved.

## A. The Complexity, Expense, and Likely Duration of the Litigation.

The first *Grinnell* factor is the complexity, expense, and likely duration of the litigation. Here, the costs, complexity, and likely duration of this case strongly favor settlement. As courts recognize, data breach class actions are inherently complex and "involve[ ] thorny issues regarding the emerging field of data breach litigation." *Holden v. Guardian Analytics, Inc.*, No. 2:23-CV-2115, 2024 WL 2845392, at *5 (D.N.J. June 5, 2024); *see also Fulton-Green v. Accolade, Inc*., No. 18-274, 2019 WL 4677954, at *8 (E.D. Pa. Sept. 24, 2019) (recognizing data breach litigation as complex, risky, and uncertain). Because the legal issues involved in [data breach litigation] are cutting-edge and unsettled … many resources would necessarily be spent litigating substantive law as well as other issues." *In re Target Corp. Customer Data Sec. Breach Litig.*, No. 14-md-2522 (PAM) (JJK), 2015 WL 7253765, at *2 (D. Minn. Nov. 17, 2015), *rev'd and remanded on other grounds*, 847 F.3d 608 (8th Cir. 2017), *amended*, 855 F.3d 913 (8th Cir. 2017), *and aff'd*, 892 F.3d 968 (8th Cir. 2018).

Another issue attendant in continued litigation is the expense of conducting further discovery. In complex cases, such as data breach and privacy cases, these costs can be especially extensive. *See Carter v. Vivendi Ticketing US LLC*, No. SACV2201981CJCDFMX, 2023 WL 8153712, at *5 (C.D. Cal. Oct. 30, 2023) (early resolution of data breach action favored final approval where "[s]ubstantial discovery, including document discovery and depositions, would be required" along with "[e]xtensive and expensive expert analysis [that also] would be needed."); *In re Yahoo! Inc. Customer Data Security Breach Litig.*, No. 16-MD-02752, 2020 WL 4212811, at *9 (N.D. Cal. July 22, 2020) (noting that discovery is one of the significant expenses for continuing a data breach litigation). Given the highly technical nature of data breach litigation, it is very likely that discovery costs in this action would be substantial. Such costs would have been amplified by the involvement of experts to further analyze and explain the data and their relevance to the case.

*See Bezdek*, 79 F. Supp. 3d at 344 (noting that potential expenses stemming from further discovery can "decreas[e] the net benefit of any damages awarded obtained at trial").

While Plaintiff is confident in the strength of his case, by reaching a favorable settlement at this stage of the litigation, however, the Parties will avoid significant expense and delay and instead, provide immediate and tangible relief to the Settlement Class. *See Holden*, 2024 WL 2845392, at \*5 ("Although Plaintiffs believe they would ultimately prevail, litigation of this matter through trial would be complex, costly, and time-consuming. The Settlement eliminates the costs and risks associated with further litigation. The Settlement Class would also receive prompt compensation."). Accordingly, this factor strongly supports final approval of the Settlement.

### B. The Reaction of the Settlement Class to the Settlement

The second *Grinnell* factor is the reaction of the Settlement Class to the Settlement. It is important to note that the existence of an objection to a settlement does not by itself prevent the court from approving the agreement. Rather, this factor weighs in favor of granting final approval so long as the reaction of the class is "positive." *In re Tyco*, 535 F. Supp. 2d at 261 (noting that "only a small number" of class members had raised objections and that their objections were "without merit"); *accord Bussie*, 50 F. Supp. 2d at 77 ("[The low] number of requests for exclusion from the settlement, as well as the number and substance of objections filed ... constitutes strong evidence of fairness of proposed settlement and supports judicial approval."). In cases where a small portion of class members respond to the notice of settlement, this factor can still weigh in favor of approval where the responding class members react positively and offer little objection. *See Roberts*, 2016 WL 8677312, at \*6.

Here, the positive reaction of the Settlement Class weighs in favor of final approval. The Notice advised Settlement Class Members of their right to object to the Settlement and to otherwise opt out of the Settlement. Azari Decl. ¶¶ 12, 17, 19; Attachment 1–3. Settlement Class Members

have until April 25, 2025, to object or opt out of the Settlement, and, as of April 10, 2025, no Settlement Class Members have filed an objection, and only six have opted out of the Settlement. Azari Decl. ¶ 22. The low number of opt outs and objections support finding the Settlement is reasonable. *See Roberts*, 2016 WL 8677312, at *6 (approving final settlement where, out of 4,018 class members, none objected to the settlement and three class members asked to be excluded from the settlement); *Hashemi v. Bosley, Inc.*, No. CV 21-946 PSG (RAOX), 2022 WL 18278431, at *6 (C.D. Cal. Nov. 21, 2022) ("Very few objections and opt-outs create a strong presumption that the Settlement is beneficial to the Class and thus warrants final approval."); *In re Cabletron Sys., Inc. Sec. Litig.*, 239 F.R.D. 30, 35-36 (D.N.H. 2006) (approving class action settlement after no objections and three opt-outs).

Given the reaction of the Settlement Class, this factor weighs in favor of final approval of the Settlement.

### C.  The Stage of the Proceedings and Amount of Discovery

The third *Grinnell* factor considers the stage of the proceedings and amount of discovery. In evaluating the stage of the case and the discovery taken, courts do not require that discovery be complete, rather the relevant inquiry is whether "sufficient discovery" was conducted "to make an intelligent judgment about settlement." *Hochstadt v. Bos. Sci. Corp.*, 708 F. Supp. 2d 95, 107 (D. Mass. 2010). Put differently, while the parties need not engage in extensive discovery, they must have conduct "a sufficient factual investigation . . . to afford the Court the opportunity to 'intelligently make … an appraisal' of the Settlement.'" *Diaz v. FCI Lender Servs., Inc.*, No. 17-CV-8686 (AJN), 2020 WL 4570460, at *4 (S.D.N.Y. Aug. 7, 2020) (citation omitted).

Here, the Parties reached the proposed Settlement after engaging in a sufficiently adequate amount of informal discovery via the mediation process, while Co-Lead Counsel, Liaison & Coordinating Counsel, the Committee Chairs, and others working with them engaged in an in-

depth factual investigation into the claims underlying this MDL. Lynch Decl. ¶ 17. The information uncovered and reviewed by Co-Lead Counsel and the Settlement Committee provided them with the information needed to objectively evaluate the strengths and weaknesses of Plaintiff's and Settlement Class Members' claims. *Id.*

Additionally, the Security Incident is part of the larger MOVEit data breach that spawned numerous cases consolidated in the MDL. Co-Lead Counsel, who the Court appointed to manage the related actions in the MDL, have been informed by their investigations and litigation of those consolidated actions. *Id.* ¶ 18. Co-Lead Counsel's and the Settlement Committee's experience representing plaintiffs and other data breach victims in the *MOVEit* MDL provided further knowledge and background to guide their assessment of the reasonableness of the Settlement. *See, e.g.*, *id.*

The information received from NSC and obtained in overseeing plaintiffs in the MDL, along with Settlement Committee's experience litigating data breach actions, provided counsel with sufficient information to evaluate the strengths and weaknesses of the claims and defenses in this case, and to assess the reasonableness of the Settlement. Lynch Decl. ¶¶ 29–29. Based on the information available to Co-Lead Counsel and the Settlement Committee, their respective experience in data breach litigation generally, and their experience in the *MOVEit* MDL specifically, Co-Lead Counsel and the Settlement Committee believe the Settlement to be fair, reasonable, and adequate. *Id.* ¶¶ 7, 30. Because the information produced during the mediation process adequately inform the Parties about their respective litigation positions, this factor weighs in favor of final approval. *See, e.g.*, *Holden*, 2024 WL 2845392, at *5 (in a data breach settlement, recognizing that the parties adequately appreciated the merits of the case through their factual

investigation and the mediation process even though the case settled prior to the parties engaging in formal discovery).

**D.    The Risks of Establishing Liability and Damages.**

The fourth and fifth *Grinnell* factors evaluate the risks of establishing liability and damages. In assessing these factors, a court "need not decide the merits of the case, resolve unsettled legal questions, or attempt to predict the outcome." *In re Namenda Direct Purchaser Antitrust Litig.*, 462 F. Supp. 3d 307, 313 (S.D.N.Y. 2020). Rather, the Court should balance the benefits afforded to the Class, including the immediacy and certainty of recovery, against the continuing risks of litigation. *See Grinnell*, 495 F.2d at 463.

Here, Plaintiff is confident that he has a strong case against NSC, but winning a judgment would require surmounting several legal hurdles, with a recovery at the end of the day being far from certain. *See In re Sonic Corp. Customer Data Sec. Breach Litig.*, No. 1:17-MD-2807, 2019 WL 3773737, at *7 (N.D. Ohio Aug. 12, 2019) ("Data breach litigation is complex and risky. This unsettled area of law often presents novel questions for courts"). Specifically, had litigation proceeded, NSC would likely have argued that Plaintiff's primary cause of action (negligence) would fail, an argument that while Plaintiff believes is unfounded, has been accepted by courts, and could stymie the Settlement Class's recovery. *Compare In re LastPass Data Sec. Incident Litig.*, No. CV 22-12047, 2024 WL 3580646, at *7 (D. Mass. July 30, 2024) (dismissing negligence claim arising from a data breach of a provider of digital password vaults) *with In re Fortra File Transfer Software Data Sec. Breach Litig.*, No. 23-CV-60830-RAR, 2024 WL 4547212, at *8 (S.D. Fla. Sept. 18, 2024) (allowing negligence claim to proceed against user of third-party file transfer application after the application was breached by cybercriminals). In addition, there is the possibility that the Court would not certify a nationwide class. *See, e.g.*, *In re TJX Cos. Retail Sec. Breach Litig.*, 246 F.R.D. 389 (D. Mass. 2007) (denying class certification because necessity of

individualized inquiries regarding causation, comparative negligence, and damages precluded a finding of predominance). And even if Plaintiff was successful in having a class certified, he risked a jury finding against himself and the Settlement Class on liability and/or damages. *See In re Equifax Inc. Customer Data Sec. Breach Litig.*, No. 1:17-MD-2800-TWT, 2020 WL 256132, at *10 (N.D. Ga. Mar. 17, 2020), *aff'd in part, rev'd in part and remanded*, 999 F.3d 1247 (11th Cir. 2021) ("The likelihood of success at trial is uncertain at best."); *see also In re Sonic Corp.*, 2019 WL 3773737, at *7 ("juries are always unpredictable").

In addition, had the litigation continued, proving damages and liability would have likely required significant expert testimony and analysis. *See Carter*, 2023 WL 8153712, at *5 (recognizing at final approval that had data breach case proceeded, "[e]xtensive and expensive expert analysis would be needed."). Although Plaintiff believes that expert testimony would provide evidence sufficient to establish the measure of damages in this case, it is possible that, in the unavoidable "battle of experts," a jury might disagree with Plaintiff's expert, find Defendant's expert more persuasive, or agree with the Plaintiff's expert but award a reduced amount of damages to the Settlement Class. *In re Tyco*, 535 F. Supp. 2d at 260–61 ("[E]ven if the jury agreed to impose liability, the trial would likely involve a confusing "battle of the experts" over damages. If, faced with conflicting expert testimony, the jury chose to embrace the most conservative estimate of damages, then the ultimate award might turn out to be less than the proposed settlement."). As such, Plaintiff faced the risk of a non-monetary recovery for members of the Settlement Class even if he was able to establish NSC's liability.

In the face of these risks, and in Class Counsel's experienced and realistic opinion, the Settlement provides substantial benefits to the Settlement Class, including the reimbursement of

out-of-pocket losses, an Alternative Cash Payment, credit monitoring, and agreed upon injunctive relief. Lynch Decl. ¶¶ 15, 21–22. As such, these factors favor final approval.

### E.    The Risks of Maintaining the Class Action Through Trial.

The sixth *Grinnell* factor considers the risks of maintaining the class action through trial. This factor weighs in favor of settlement where "it is likely that defendants would oppose class certification if the case were to be litigated." *In re GSE Bonds Antitrust Litig.*, 414 F. Supp. 3d 686, 694 (S.D.N.Y. 2019). Here, had litigation proceeded, NSC would likely have opposed class certification, arguing that individual issues predominate over common issues or that the class action device is not a superior form of adjudication. *See In re Marriott Int'l, Inc. Customer Data Sec. Breach Litig.*, 341 F.R.D. 128, 162 (D. Md. 2022).[4] Further, even assuming that Plaintiff was successful in certifying a class, there is a risk that NSC would ask the Court to reconsider or amend the certification decision, or appeal it, and the First Circuit would have discretion to consider interlocutory review under Rule 23(f). *See Roberts*, 2016 WL 8677312, at *7. While Plaintiff is confident in the strength of his case, and that he would overcome NSC's challenges to class certification, the opportunities where certification could fail nevertheless creates a risk of delay and a risk of Plaintiff failing to prevail, and a risk that the Settlement Class would receive nothing. *See id.* As a result, this factor weighs in favor of final approval of the Settlement.

### F.    The Ability of the Defendant to Withstand a Greater Judgment.

The seventh *Grinnell* factor looks to the defendant's ability to withstand a greater judgment. Courts have found this factor is not dispositive and need not affect the conclusion that the settlement is within the range of reasonableness. *D'Amato v. Deutsche Bank*, 236 F.3d 78, 86

---

[4] *Vacated and remanded sub nom. In re Marriott Int'l, Inc.*, 78 F.4th 677 (4th Cir. 2023), and *reinstated by In re Marriott Int'l Customer Data Sec. Breach Litig.*, 345 F.R.D. 137 (D. Md. 2023).

(2d Cir. 2001); *see also In re Sturm, Ruger, & Co., Inc. Sec. Litig.*, No. 3:09CV1293 VLB, 2012 WL 3589610, at *7 (D. Conn. Aug. 20, 2012) (a defendant is "not required to empty its coffers before a settlement can be found adequate."). This factor is relevant, however, where "judgment may risk bankruptcy or severe economic hardship." *Jermyn v. Best Buy Stores, L.P.*, No. 08 CIV. 214 CM, 2012 WL 2505644, at *7 (S.D.N.Y. June 27, 2012).

Although NSC may have the ability to withstand a greater judgment, the outstanding result—a $9.95 million settlement—compared to the risks and expenses attendant to conducing this litigation and the immediacy of the benefit to Settlement Class Members, weigh in favor of settlement. Accordingly, the Court should find the factor weighs in favor of approval, or, alternatively, "assign 'relatively little weight' to this factor." *Morris v. Affinity Health Plan, Inc.*, 859 F. Supp. 2d 611, 620–21 (S.D.N.Y. 2012).

### G. The Range of Reasonableness of the Settlement Fund in Light of the Best Possible Recovery and the Attendant Risks of Litigation.

The last two *Grinnell* factors are the range of reasonableness of the settlement fund in light of the best possible recovery and the attendant risks of litigation. These two factors are typically analyzed together. *See, e.g.*, *In re Sturm, Ruger, & Co., Inc. Sec. Litig.*, No. 3:09CV1293 VLB, 2012 WL 3589610, at *7 (D. Conn. Aug. 20, 2012). The issue is not whether the settlement represents the best conceivable recovery, but how the settlement relates to the strengths and weaknesses of the case. *Grinnell*, 495 F.2d at 462. As such, courts consider and weigh the nature of the claims, the possible defenses, the situation of the parties, and the exercise of business judgment in determining whether the proposed settlement is reasonable. *Id.* Put differently, the focus is on whether the settlement "represents a reasonable one in light of the many uncertainties the class faces." *Hall v. ProSource Techs., LLC*, No. 14-CV-2502 (SIL), 2016 WL 1555128, at *8 (E.D.N.Y. Apr. 11, 2016).

As discussed above, Plaintiff faced numerous uncertainties, including certifying a class and maintaining class certification, establishing liability and damages, and ultimately receiving a recovery. On the other hand, the $9.95 million Settlement for the approximately 1.5 million Settlement Class Members provides substantial and immediate relief to compensate them for past injuries and the continued risk of harm, along with injunctive relief that is tailored to reduce the risk of a similar security incident occurring in the future. Such relief is comparable, if not better, than other data breach settlements that have received final approval. *See, e.g.*, *Harbour v. California Health & Wellness Plan*, No. 5:21-CV-03322-EJD, 2024 WL 171192, at *2 (N.D. Cal. Jan. 16, 2024) (granting final approval to data breach settlement that provided credit monitoring, a cash payment, or a documented loss payment); *In re Forefront Data Breach Litig.*, No. 21-CV-887, 2023 WL 6215366, at *2 (E.D. Wis. Mar. 22, 2023) (granting final approval to data breach settlement that provided credit monitoring, and reimbursement for documented losses and lost time); *In re Cap. One Consumer Data Sec. Breach Litig.*, No. 119MD2915AJTJFA, 2022 WL 18107626, at *12 (E.D. Va. Sept. 13, 2022) (approving proposed allocation plan that allowed class members to submit claims for out-of-pocket losses, lost time, and credit monitoring services); *In re Lincare Holdings Inc. Data Breach Litig.*, No. 8:22-CV-01472-AAS, 2024 WL 3104286, at *3 (M.D. Fla. June 24, 2024) (final approval granted to $7.5 million settlement fund that would benefit approximately 2.9 million class members); *Sherwood, et al. v. Horizon Actuarial Services LLC*, Case No. 1:22-cv-01495 (N.D. Ga. Apr. 2, 2024) (ECF No. 94) (final approval to $8.73 million settlement fund that would benefit approximately 1.3 million class members); *In re MOVEit Customer Data Sec. Breach Litig.*, No. 1:23-md-03083 (D. Mass.) (ECF No. 1432) (granting final approval to settlement agreement against one of several relevant defendants that provided credit monitoring, and reimbursement for documented losses and lost time). Given the risks of continued

litigation compared to the Settlement's substantial and immediate benefits, these factors also favor final approval and thus the Court should find the Settlement falls within the range of reasonableness.

## II. The Settlement Benefits Plan is Fair, Reasonable, and Adequate and Should be Finally Approved

A plan for allocating settlement proceeds, like the settlement itself, should be approved if it is fair, adequate, and reasonable. *Bos. Sci. Corp.*, 708 F. Supp. at 109 (citation omitted). "A plan of allocation is fair and reasonable as long as it has a 'reasonable, rational basis.'" *New England Biolabs*, 2022 WL 20583575, at *4. "A reasonable plan of allocation need not necessarily treat all class members equally, but may allocate funds based on the extent of class members' injuries and consider the relative strength and values of different categories of claims." *Hill*, 2015 WL 127728, at *11 (internal citations and quotations omitted). "In determining whether a plan of allocation is fair and reasonable, courts give great weight to the opinion of experienced counsel." *Id.*

Here, the proposed Settlement Benefits Plan meets this standard. It provides all Settlement Class Members with the same opportunity to file claims for two (2) years of credit monitoring and identity theft protection, and either (1) reimbursement of ordinary losses up to $2,500.00 (including lost time of up to four (4) hours at $25.00 per hour) and reimbursement of extraordinary losses up to $10,000.00; or (2) an alternative cash payment of $100.00 (subject to *pro rata* reduction or increase based on total claim submission). The Settlement Benefits Plan was designed to provide equal treatment to those who did not incur out of pocket losses while allowing for individualized compensation to Settlement Class Members who incurred expenses as a result of the Security Incident. The proposed Settlement Benefits Plan is similar to other court-approved allocation plans in other data breach cases. *See* Argument I.G. For these reasons, the proposed Settlement Benefits Plan is fair, reasonable, and adequate and should be finally approved.

**III. The Court Should Finally Certify the Settlement Class.**

In finally approving a class action settlement, the Court must also determine whether to certify the class for settlement purposes. *In re Colgate-Palmolive Softsoap Antibacterial Hand Soap Mktg. & Sales Pracs. Litig.*, No. 12-MD-2320-PB, 2015 WL 7282543, at *5 (D.N.H. Nov. 16, 2015). Courts have repeatedly found data breach classes meet the class certification requirements. *See, e.g.*, *Attias v. CareFirst, Inc.*, 346 F.R.D. 1 (D.D.C. 2024); *Savidge v. Pharm-Save, Inc.*, No. 3:27-cv-186, 2024 WL 1366832 (W.D. Ky. Mar. 29, 2024); *In re Marriott*, 341 F.R.D. at 173; *In re Sonic Corp. Customer Data Breach Litig.*, No. 1:17-md-02807-JSG, 2020 WL 6701992 (N.D. Ohio Nov. 11, 2020); *In re Target Corp. Customer Data Sec. Breach Litig.*, 309 F.R.D. 482, 490 (D. Minn. 2015). Indeed, data breach actions conform to the "policy at the very core of the class action mechanism . . . to overcome the problem that small recoveries do not provide the incentive for any individual to bring a solo action prosecuting his or her rights." *Amchem Prods., Inc. v. Windsor*, 521 U.S. 591, 617 (1997).

In considering whether to certify a Settlement Class, courts look to Rule 23 of the Federal Rules of Civil Procedure. *See id.* at 620-21. Rule 23(a) creates four threshold requirements applicable to all class actions: (1) numerosity, (2) commonality, (3) typicality, and (4) adequacy. Fed. R. Civ. P. 23(a)(1)-(4); *see also Amchem*, 521 U.S. at 613. Additionally, the proposed class must meet one of the requirements of Rule 23(b). *Id.* Where, as here, a Rule 23(b)(3) damages class is proposed, plaintiffs must show "the questions of law or fact common to the class members predominate over any questions affecting only individual members, and that a class action is superior to other available methods for fairly and efficiently adjudicating the controversy." Fed. R. Civ. P. 23(b)(3). These requirements are generally referred to as "predominance" and "superiority." Here, as described below, the Rule 23(a) and (b) requirements are satisfied, and the Court should certify the Settlement Class.

## A. The Settlement Class Meets the Requirements of Rule 23(a).

Rule 23(a) provides four prerequisites that any proposed class must meet. These prerequisites are: (1) the class is so numerous that joinder of all members is impracticable ("numerosity"); (2) there are questions of law or fact common to the class ("commonality"); (3) the claims or defenses of the representative parties are typical of the claims or defenses of the class ("typicality"); and (4) the representative parties will fairly and adequately protect the interests of the class ("adequacy"). Fed. R. Civ. P. 23(a)(1)–(4). The proposed Settlement Class meets all four Rule 23(a) requirements.

### 1. Numerosity.

Under Rule 23(a)(1), the class must be "so numerous that joinder of all members is impracticable." Fed. R. Civ. P. 23(a)(1). "The threshold for establishing numerosity is low, and '[c]lasses of 40 or more have been found to be sufficiently numerous.'" *Meaden*, 2023 WL 3529762, at *2 (citation omitted). Here, the Settlement Class is so numerous that joinder is impracticable. The Settlement Class consists of approximately 1.5 million individuals, far surpassing the threshold number of 40. Moreover, all Settlement Class Members have already been identified by NSC during its investigation of the Security Incident and its issuance of notice to affected individuals. *See Engel v. Scully & Scully, Inc.*, 279 F.R.D. 117, 127–28 (S.D.N.Y. 2011) (holding defendants' business records may be used to ascertain class members). Numerosity is met here.

### 2. Commonality.

Under Rule 23(a)(2), the Settlement Class must share common questions of law or fact. The commonality requirement is not demanding. Rather, it is a "low bar" and may be satisfied by a single common question of fact or law. *In re New Motor Vehicles Canadian Exp. Antitrust Litig.*, 522 F.3d 6, 19 (1st Cir. 2008). Commonality is met where the claims "depend upon a common

contention" that is "of such a nature that it is capable of class-wide resolution—which means that determination of its truth or falsity will resolve an issue that is central to the validity of each one of the claims in one stroke." *Wal-Mart Stores v. Dukes*, 564 U.S. 338, 347 (2011).

Here, the Settlement Class shares numerous common questions of law and fact, and the answers to those common questions will have a class-wide effect. To start, Plaintiff's and Settlement Class Members' Social Security numbers were collected and transferred by NSC in the regular course of NSC's business. As a result of the Security Incident and NSC's use of MOVEit Transfer, each Settlement Class Member's Social Security number was accessed and obtained by cybercriminals. *In re Anthem, Inc. Data Breach Litig.*, 327 F.R.D. 299, 308 (N.D. Cal. 2018) (commonality satisfied where "[t]he extensiveness and adequacy of Anthem's security measures lie at the heart of every claim."). Consequently, Plaintiff and Settlement Class Members all suffered similar injuries, including, *inter alia*: the risk of harm from the misuse of their data; the loss of privacy from cybercriminals obtaining their Social Security numbers; and out-of-pocket costs and lost time spent investigating the Security Incident and mitigating the risk of future misuse of their Social Security numbers. *Id.* ("[T]he Settlement Class Members suffered the same injury— namely, their personal information was stored on the same Anthem data warehouse that was breached by hackers.).

While only one common question is sufficient to satisfy commonality, here, Plaintiff and Settlement Class Members' claims present numerous additional common issues, including but are not limited to:

- Whether NSC owed Plaintiff and the Settlement Class a duty to reasonably secure their Social Security numbers;

- Whether NSC breached its duty by failing to implement and maintain adequate data security, failing to protect data transferred via MOVEit Transfer, and failing to patch vulnerabilities within MOVEit Transfer;

- Whether NSC's breach of duty caused harm to Plaintiff and the Settlement Class, including the theft of their Social Security numbers;

- Whether Plaintiff and the Settlement Class suffered harm due to the theft and potential misuse of their Social Security numbers; and

- Whether Plaintiff's and Settlement Class Members' damages are reasonably quantifiable.

The existence of these common legal questions and the overwhelmingly similar factual issues presented by Settlement Class Members' claims suffice to meet commonality here.

### 3. Typicality.

Rule 23(a)(3) requires that "the claims or defenses of the representative parties [be] typical of the claims or defenses of the class." Fed. R. Civ. P. 23(a)(3). "To establish typicality, the plaintiffs need only demonstrate that 'the claims or defenses of the class and the class representative arise from the same event or pattern or practice and are based on the same legal theory.'" *M3 Power*, 270 F.R.D. at 54. "The claims of the class representative and the class overall must share essential characteristics, but they need not be precisely identical." *Bezdek*, 79 F. Supp. 3d at 338.

Here, Plaintiff's claims are typical of those of Settlement Class Members because they were all impacted by the same Security Incident—a data incident in which their Social Security numbers were accessed by an unauthorized third party—and involve the same overarching legal theories, including theories that NSC failed to safeguard their Social Security numbers. *See Abubaker v. Dominion Dental USA, Inc.*, No. 119CV01050LMBMSN, 2021 WL 6750844, at *3 (E.D. Va. Nov. 19, 2021) (typicality satisfied where plaintiffs and settlement class members were subject to a data breach and were alleged to have suffered the same type of injuries); *In re Anthem*, 327 F.R.D. at 309 (typicality satisfied because the class representatives, like the class as a whole

each that their personal information stored on defendant's systems and that information was exfiltrated during a breach of such systems). Plaintiff's legal theories do not conflict with those of absentee Settlement Class Members, and Plaintiff has and will continue to represent the interests of all Settlement Class Members fairly, because such interests parallel his own. As such, Rule 23(a)(3)'s typicality requirement is satisfied.

### 4. Adequacy.

Rule 23(a)(4) requires that the proposed class representative "fairly and adequately protect the interests of the class." Fed. R. Civ. P. 23(a)(4). "This requirement has two parts. The plaintiffs 'must show first that the interests of the representative party will not conflict with the interests of any of the class members, and second, that counsel chosen by the representative party is qualified, experienced and able to vigorously conduct the proposed litigation.'" *In re M3 Power*, 270 F.R.D. at 55.

Here, Plaintiff satisfies both requirements. First, Plaintiff's interests align with, and are not adverse or antagonistic to, those of Settlement Class Members. Plaintiff seeks to hold NSC accountable for, among other things, its failure to safeguard Plaintiff's and Settlement Class Members' Social Security numbers. As such, Plaintiff seeks to hold NSC accountable for the same alleged wrongdoing that caused the Settlement Class to suffer similar harm—the theft and risk of misuse of their personal information. Plaintiff's interests therefore fully align with those of the Settlement Class. *See In re Anthem*, 327 F.R.D. at 309-11 (finding the adequacy requirement satisfied where all class members had their personal information compromised in the data breach and generally sought the same relief).

Second, Class Counsel are qualified, experienced, and competent in complex litigation, and have an established, successful track record in class litigation—including cases analogous to this one. ECF No. 1223 ¶ 41. Class Counsel and Plaintiff have diligently advanced the interests of

the Settlement Class, including by investigating the Security Incident and resolving the case through this Settlement. Accordingly, Rule 23(a)(4)'s adequacy requirement is satisfied.

**B.      The Settlement Class Meets the Requirements of Rule 23(b).**

Under Rule 23(b)(3), a class action should be certified when the court finds that common questions of law or fact predominate over individual issues and a class action would be superior to other methods of resolving the controversy. The predominance inquiry "tests whether proposed classes are sufficiently cohesive to warrant adjudication by representation." *Amchem*, 521 U.S. at 594, 623. "The superiority inquiry [ ] ensures that litigation by class action will 'achieve economies of time, effort, and expense, and promote . . . uniformity of decision as to persons similarly situated, without sacrificing procedural fairness or bringing about other undesirable results.'" *In re Solodyn (Minocycline Hydrochloride) Antitrust Litig.*, No. CV 14-MD-02503, 2017 WL 4621777, at *21 (D. Mass. Oct. 16, 2017) (citation omitted). Here, the Settlement Class readily meets both requirements.

**1.      Common Issues Predominate Over Individual Issues.**

A Rule 23(b)(3) settlement class must show that common questions "predominate over any questions affecting only individual [class] members." *Amgen Inc. v. Connecticut Ret. Plans & Tr. Funds,* 568 U.S. 455, 459 (2013). Predominance "does not require that each element of the claims [be] susceptible to class-wide proof" but only that "the individualized questions . . . [do] not 'overwhelm' the common ones." *In re Celexa & Lexapro Mktg. & Sales Pracs. Litig.*, 325 F.R.D. 529, 537 (D. Mass. 2017) (citation omitted). "When one or more of the central issues in the action are common to the class and can be said to predominate, the action may be considered proper under Rule 23(b)(3) even though other important matters will have to be tried separately, such as damages or some affirmative defenses peculiar to some individual class members." *Tyson Foods, Inc. v. Bouaphakeo*, 577 U.S. 442, 453 (2016).

Here, common issues predominate over individual issues because each Settlement Class Member would rely on common factual evidence to establish NSC's liability. Each Settlement Class Member's claim centers on NSC's allegedly inadequate data security and NSC's use of MOVEit Transfer which, Plaintiff alleges, NSC knew or should have known could result in a data breach and harm to Plaintiff and the Settlement Class. Despite that knowledge, Plaintiff contends NSC knowingly used inadequate data security. Proof of those facts would establish NSC's duty and breach of duty on a class-wide basis, and proof of those facts depends exclusively on NSC's knowledge and actions. Thus, those elements of each Settlement Class Member's claim are resolvable in a "single stroke" and do not depend on any individualized issue. *Dukes*, 564 U.S. at 347; *see also In re Brinker Data Incident Litig.*, 3:18-cv-0686, 2021 WL 1405508, at *8 (M.D. Fla. Apr. 14, 2021) (granting class certification because common questions predominated, including "whether [defendant] had a duty to protect customer data, whether [defendant] knew or should have known its data systems were susceptible, and whether [defendant] failed to implement adequate data security measures"), *vacated in part sub nom. Green-Cooper v. Brinker Int'l, Inc.*, 73 F.4th 883 (11th Cir. 2023).

Additionally, common issues concerning causation and damages predominate. Whether NSC's alleged misconduct, in part, caused the Security Incident and the resulting theft of Plaintiff's and Settlement Class Members' data will depend on common evidence comparing Progress's and NSC's knowledge and acts and their contribution to the breach. Further, as other courts have recognized, Plaintiff can establish damages on a class-wide basis using models to measure the diminished value of the stolen data and the lost time and effort incurred responding to the breach. *See, e.g.*, *Green-Cooper*, 73 F.4th at 889–90 (approving plaintiffs' method for measuring class damages due to a data breach). Although each individual Settlement Class Member may have some

individualized damages, those individual damages generally do not defeat class certification. *Corra v. ACTS Ret. Servs., Inc.*, No. CV 22-2917, 2024 WL 22075, at *5 (E.D. Pa. Jan. 2, 2024) ("Although there may be slight differences among class members regarding degree of damages or the exact type of injury suffered (e.g., breach of sensitive financial information or breach of health data), none of these differences would preclude resolution on a class-wide basis."). For these reasons, predominance is satisfied.

### 2. A Class Action is the Superior Device for Adjudicating the NSC Action.

The superiority criterion requires that class action be "superior to other available methods for fairly and efficiently adjudicating the controversy." Fed. R. Civ. P. 23(b)(3). In evaluating superiority, courts consider: (1) the interests of class members in individually litigating separate actions, (2) the extent and nature of existing litigation, (3) the desirability of concentrating the litigation of the claims in one forum, and (4) the difficulty of managing a class action. *Id.* "The superiority inquiry thus ensures that litigation by class action will 'achieve economies of time, effort, and expense, and promote . . . uniformity of decision as to persons similarly situated, without sacrificing procedural fairness or bringing about other undesirable results.'" *In re Solodyn*, 2017 WL 4621777, at *21 (citation omitted). Where a "large number of potential plaintiffs" share common claims, "certifying the class will allow a more efficient adjudication of the controversy than individual adjudications would." *Roberts v. Source for Pub. Data*, No. 08-CV-04167-NKL, 2009 WL 3837502, at *7 (W.D. Mo. Nov. 17, 2009).

Here, class resolution is superior to other available means for the fair and efficient adjudication of the claims asserted against NSC. First, the potential damages suffered by the approximately 1.5 million Settlement Class Members are relatively low dollar amounts and would be uneconomical to pursue on an individual basis given the burden and expense of prosecuting individual claims. *In re Anthem*, 327 F.R.D. at 315 (superiority satisfied in data breach settlement

where the "the amount at stake for individual Settlement Class Members is too small to bear the risks and costs of litigating a separate action."). Second, there is little doubt that resolving all Settlement Class Members' claims jointly, particularly through a class-wide settlement negotiated on their behalf by counsel well-versed in class action litigation, is superior to a series of individual lawsuits and promotes judicial economy. *See In re Cap. One*, 2022 WL 18107626, at *5 (recognizing that litigating the claims of millions of individuals impacted by a data breach would be inefficient).

For these reasons, the Settlement Class satisfies the requirements of Rule 23(a) and (b)(3) and Plaintiff respectfully requests that the Court finally certify the Settlement Class for purposes of Settlement.

## IV. The Notice Program Satisfied Rule 23 and Due Process by Providing Settlement Class Members with Adequate Notice of the Settlement.

Rule 23(e)(1)(B) provides that "[t]he court must direct notice in a reasonable manner to all class members who would be bound by the [settlement]." Fed. R. Civ. P. 23(e)(1)(B). In addition, "[f]or any class certified under Rule 23(b)(3) … the court must direct to class members the best notice that is practicable under the circumstances, including individual notice to all members who can be identified through reasonable effort." Fed. R. Civ. P. 23(c)(2)(B). The Class Notice plan satisfied these requirements.

Here, following the Court's approval of the Notice plan, the Settlement Administrator directed notice to the Settlement Class via direct mail and email notice. Azari Decl. ¶¶ 11, 14. To ensure the Notice reached as many Settlement Class Members as possible, the Settlement Administrator performed reasonable email and physical address checks for the Short Form Notice. *Id.* ¶¶ 11–15. Finally, the Settlement Administrator is in the process of preparing to send a Reminder Notice via email to all Settlement Class Members who have not yet filed claims or

otherwise opted out of the Settlement. *Id.* ¶ 24. Courts have recognized that direct email and mail satisfy due process. *See Wright v. S. New Hampshire Univ.*, 565 F. Supp. 3d 193, 207 (D.N.H. 2021) (notice to class via direct email and mail notice "constitute[d] a reasonable manner of providing notice to those parties who would be bound by the terms of the proposed settlement agreement"); *Meaden v. HarborOne Bank*, No. 23-CV-10467-AK, 2023 WL 3529762, at *4 (D. Mass. May 18, 2023) (same).

Further, the Notice included important information about the Settlement, including how to opt-out or object, where to find more information about the Settlement, and how to contact Class Counsel. *Id.* ¶ 19; Attachment 1–3. Additionally, the Notice was designed to be "noticed," reviewed, and—by presenting the information in plain language—understood by Settlement Class Members. *Id.* ¶ 28. The design of the Notice followed principles embodied in the Federal Judicial Center's illustrative "model" notices posted at www.fjc.gov, and contained plain-language summaries of key information about Settlement Class Members' rights and options. As required by Rule 23(e), the Notice generally described the Settlement in sufficient detail to alert Settlement Class Members to come forward to be heard, and contained all of the critical information required to apprise Settlement Class Members of their rights. *Id.* ¶¶ 26–27. Thus, the notice plan is adequate and provided sufficient detail to allow Settlement Class Members with adverse viewpoints to come forward and be heard. *See Hill v. State Street Corp.*, No. 09-12146-GAO, 2015 WL 127728, at *14 (D. Mass. Jan. 8, 2015) (notice must be "reasonably calculated, under all the circumstances, to apprise interested parties of the pendency of the action and afford them an opportunity to present their objections").

The Federal Judicial Center states that a notice plan that reaches 70% of class members is one that reaches a "high percentage" and is within the "norm." Barbara J. Rothstein & Thomas E.

Willging, Federal Judicial Center, "Managing Class Action Litigation: A Pocket Guide or Judges," at 27 (3d ed. 2010).[5] The reach of 95.8% for this Notice plan far surpasses that threshold. The Notice to the Settlement Class here was the best notice that is practicable and is equivalent or superior to notice campaigns approved in similar class action settlements. *Id.* ¶¶ 25–29.

### CONCLUSION

For the foregoing reasons, Plaintiff respectfully requests that the Court enter the proposed Final Approval Order and Final Judgement, filed herewith: (i) granting Final Approval of the Settlement; (ii) finally certifying the Settlement Class for purposes of settlement; and (iii) providing other such relief required to effectuate the Settlement.

Dated: April 11, 2025

Respectfully submitted,

By: */s/ Kristen A. Johnson*
    Kristen A. Johnson (BBO# 667261)
HAGENS BERMAN SOBOL SHAPIRO LLP
1 Faneuil Hall Square, 5th Fl.
Boston, MA 02109
Tel: (617) 482-3700
Fax: (617) 482-3003
kristenj@hbsslaw.com

*Liaison & Coordinating Counsel*

By: */s/ E. Michelle Drake*
    E. Michelle Drake
BERGER MONTAGUE, PC
1229 Tyler St., NE, Ste. 205
Minneapolis, MN 55413
Tel: (612) 594-5933
Fax: (612) 584-4470
emdrake@bm.net

---

[5] This document is available at https://www.fjc.gov/sites/default/files/2012/ClassGd3.pdf.

By: /s/ Gary F. Lynch
    Gary F. Lynch
LYNCH CARPENTER, LLP
1133 Penn Ave., 5th Fl.
Pittsburgh, PA 15222
Tel: (412) 322-9243
Fax: (412) 231-0246
Gary@lcllp.com

By: /s/ Douglas J. McNamara
    Douglas J. McNamara
COHEN MILSTEIN SELLERS & TOLL PLLC
1100 New York Ave. NW, 8th Fl.
Washington, DC 20005
Tel: (202) 408-4600
dmcnamara@cohenmilstein.com

By: /s/ Karen H. Riebel
    Karen H. Riebel
LOCKRIDGE GRINDAL NAUEN PLLP
100 Washington Ave. S., Ste. 2200
Minneapolis, MN 55401
Tel: (612) 339-6900
Fax: (612) 612-339-0981
khriebel@locklaw.com

By: /s/ Charles E. Schaffer
    Charles E. Schaffer
LEVIN SEDRAN & BERMAN LLP
510 Walnut Street, Ste. 500
Philadelphia, PA 19106
Tel: (215) 592-1500
Fax: (215) 592-4663
cshaffer@lfsblaw.com

*Lead Counsel for Plaintiffs*

**CERTIFICATE OF SERVICE**

I hereby certify that, on this date, the foregoing document was filed electronically via the Court's CM/ECF system, which will send notice of the filing to all counsel of record.

Dated: April 11, 2025

/s/ Kristen A. Johnson
Kristen A. Johnson (BBO# 667261)